Good morning, your honors. Tim Shelton for the petitioner, respondent rather, Walsh Construction Company. This is also a repetitive trauma case, and it raises a jurisdictional issue under notice under 6C. It's whether the claimant, Carl Guy, gave notice of his injury to the employer, Walsh Construction, within the 45-day limit. The governing rule is the reasonable person rule. It's the date that the injury manifests itself is the date on which both the fact of the injury and its causal relationship to the employment would have been plainly apparent to a reasonable person, i.e. employee. It's the date that the injury manifested And the Commission is wrong. And what is it about September that establishes anything else? That's our major point. You just hit on it. Yes, he did say it got progressively worse. Yet, he never stopped working. There's no evidence that this injury even affected his ability to work. He said that he felt pain doing the basic chores of his duty. He said that in February 2006. He never said anything in September. He never reported to the doctor. He didn't go see the doctor. He had no more medical treatment through the entire summer before September. In September, the same doctor said exactly the same thing that that doctor said in February. There's been no change. Nothing has occurred. I know that rule about progressive and it gets harder to work. But this man continued to work for Walsh into January 2007 and for three other employers as an oiler operator until the week before the hearing in September 2007. I understand your argument. Let's put it in the context of what the issue is in this case. In a manifest weight issue, as you know, we would have to find an opposite conclusion. It's clearly apparent to overturn the Commission's decision, correct? Mm-hmm. So why is an opposite conclusion to the one they came to clearly apparent? My belief is that the most relevant and probative evidence as to when that very clear rule of when the manifestation date occurred would be the claimant himself, his own statement about what happened. It's like in Durand. You know, the claimant there didn't – she lived with repetitive trauma for three years. The court ruled that when she sought medical treatment was when it became the manifestation date. He sought medical treatment in February 2006, having been suffering for months. It's his own testimony. That's not contradicted anywhere, and that is in Dr. Jovanovic's records. One places him on notice that the condition was caused by a work-related circumstance. In February, he said that he was told by the doctor in his testimony. How do you think that caused your carpal tunnel? He's talking about his work, because I do the same thing every day. So what changed? All of a sudden, did you have to go for medical treatment? Because it was hurting. My hands were tingling. He's talking about going in 2006. She says, he says, I went to the doctor. That's what he told me it was from. Oh, the doctor's the one that told you that? Yeah, I went to the doctor. They did a test. That's what he said. I was trying to figure out what was wrong with it. And he – and she says, okay, so he said it was from your job? Yeah, he said it was due to work. He asked me what I do, and I told him. And he said – and then the claimant goes on to say it sounded reasonably correct to me. What makes it clear in that statement that that occurred in February? It's absolutely in the context of what we're talking about. Okay. Now, you reported that you sustained an injury back in February. Okay. That's when I went to the doctor. Yeah. What test did – The rest of his testimony was – – did Jovanovic perform in February? Pardon me? What test did Jovanovic perform in February? What test did the doctor perform? He said that he had the test. Oh, yeah, the EKG was done on February 21st. It was the EMG? EMG, I'm sorry. And it was Hassan. Yeah, but – Hassan says it's not work-related. But he – but the claimant is saying that his doctor, Jovanovic, told him in February 16th. I think if you read it again, it says that he went to the doctor, the doctor performed tests, and then he told him that it was work-related. Read it again. His first comment does not say that. Okay, no. First he says, it started getting worse. I couldn't figure out what was wrong. I went to the doctor. He told me it was carpal tunnel. What about the test? Get to that part again. How long had it been bothering you? Two to three months. Then again on page 236. When I went to the doctor, that's what he told me it was. Oh, the doctor is the one that told you. Okay, here is the test thing. Yeah, I went to the doctor. They did a test. That's what he said. You know, I don't know. I don't know. I was trying to figure out what was wrong. But Jovanovic never did a test. He sent him to Hassan for a test. Yes. Okay, then by March. We'll bump this date to March. When he came back to find out the results of the test in early March, he was told at that time that it's carpal tunnel and it's related to your work. It's a little vague about the test. There's nothing in Jovanovic's records that he told him that in March. No, there is not. Isn't it possible that in that statement, the claimant was talking about the September time frame? Oh, no. It's impossible to read it that way. I cannot believe that from reading the context. If you can, you're welcome to. If you look at these pages around 230 through 236, he's clearly making a case for why he went to the doctors in February and what he learned in February. I think it's rather plainly set out there. Often it's talked about early in the year 2006. I think this case presents an interesting problem, a question really, because I'm thinking of the Oscar Mayer case that Justice McCullough authored. We talked about the fact of injury versus the fact of discovery, and that goes to this idea of getting progressively worse and so on. He discovered, but we don't really have ever a fact of an injury that prevented him from or interfered, as far as we know in the evidence of this case, with any work, which almost goes more to the causation. Did they ever even show an injury arising out of it in the course of employment? But we have, on this continuum of time, we have two points where, according to the evidence, at both points in February or early in the year and again in September, he was told by the very same doctor the very same information. I don't know if we have to belie and then say this is just discovery, but he kept discovering the same thing, and he didn't stop work. He worked for another year. He didn't go to the doctor through the summer for anything other than an unrelated blood workup. He last saw him about his carpal tunnel on May 24th. I mean, in the real-day world, why suddenly out of the blue is a letter produced certifying the same thing that the doctor told him? Well, didn't he testify that he thought he was asked to produce the letter by either the employer or the insurance carrier? Yes. Which would tend to indicate that's after he went and verbally told his boss, I've got a problem or whatever. It's not clear when that happened because he didn't tell his boss until early October, and the letter's dated September 25th. When asked, he says, I honestly don't know. I'm not sure. So he didn't say he went to inquire whether it was work-related. That question's put to him. He says, I don't know. So he finally is pretty sure that it was this woman, the risk person, who told him to go. And there's nothing in Jovanovich's records that explains why he wrote the letter. No. It just shows up. It just shows up. Aside from the manifest way to the evidence issue, from the employer's standpoint, do you really want to punish the employee for taking one for the team and sort of trying to work through the pain and stay at work, or do you want them to jump out and immediately file a claim at the first sign of an issue? I'm insisting on the manifestation date of February 2006. That's basically what you're asking us to do. Well, you know, notice is presumed, lack of notice is presumed to be prejudicial to the employer. It could be that if this person has an injury and doesn't report it and continues to work, and the cases talk about this too, until he hurts himself even more and the company has to pay even more for it, that's the counterbalance. I know your point is in all the cases. So the counterbalance in all those cases also is, but we want to make sure that the employer isn't strapped with a much bigger bill later on because the employee did exactly that, you know, manned up and took one for the team. But this guy kept, I don't know, kept taking them for the team. He took it for another year. He's never actually yet had the surgery or any of the things, as far as I know, that he was awarded. We've also had cases that involve a fact pattern where there's two insurance carriers, and obviously the insurance carrier presently wants to pass it on to the insurance carrier that was, you know, higher and sort of fighting over themselves over coverage, kind of like the hot potato. Yes. So we've had that. That could happen. But if this is a continuing same insurance carrier, so to speak, the only argument arguably would be the condition worsened to where if it were corrected earlier it would be less costly. Is that basically it? Yeah. I mean, at the beginning he was, by the way, the medical treatment and the test. They also did tests of, you know, I know there's the big electronic test, but there's also they tested his grips and so on and prescribed him right away in February, I believe, or it was early March with the latest splints, which he used, and cortisone injections, which he did not, and suggested that surgery might be down the road. Counsel, you'll have time on rebuttal. Great. Thank you very much. Counsel, please. May it please the Court. Counsel, take one for the team. I'm almost reticent to comment on several of the issues raised by counsel because I may break down and become tearful at the fact that this Board of Displaced Employers is going to have to deal with this perspective situation of having a man who operates heavy-duty equipment that vibrates, that causes all kinds of resonance while you operate it, as testified to by my client, that now they're going to say in February that's when the accident happened. When you look at Dr. Janovich's records, the first page it says, history, it says complaints of stomach pain, numbness in fingers, operating engineer. The doctor does not delineate in his chart note anything other than the date and the results of some blood workup, any commentary about the fact that he has or has not got carpal tunnel syndrome. As Justice Hoffman pointed out, Dr. Hassan, the neurologist who performed the EMG, says this is not a result of any overt trauma or work-related injury. His symptoms are worse when he's lying down and standing. The next visit back to Dr. Janovich is back in March, and in March he goes in and talks about his blood test. And for the first time, Dr. Janovich says EMG, first time he's reviewing it, showed a CTS, et cetera. Nothing in this hieroglyphic entry says work-related. Now, thank you, Your Honor. Hieroglyphics are discernible, that's true, ever since Dead Sea Scrolls and a few other things. Anyway, the bottom line is this. This man was not working in a capacity of a heavy equipment operator in January of 06. He was in a classroom attempting to get certified for his ability to operate a crane in the city. Number two, he took his girlfriend to a Caribbean trip in February, obviously after he saw Dr. Janovich, or before he saw Dr. Janovich and had this EMG test. He then went back to work, as the payroll records demonstrate, commencing in March, and he continued to work until he encountered the safety manager, Mr. Lockhart, who unfortunately, as you read his testimony, is relatively vague in total as to what he remembered, what he didn't remember, what could have happened, what might have happened, and so on. So the question then becomes, what inference do you draw for this laborer, this heavy equipment operator, this guy who makes boo-coo dollars, as we saw in his average weekly wage calculation, why does he go to Janovich to get this note that says he has this condition and it's work-related? Somebody asked him for that. Somebody at Walsh said, prove it, big guy. Establish for us that there is, in fact, a work-related situation going on now. He did that. He produced Janovich's records. And then he gets sent to a specialist, Dr. John Fernandez, not Ferdinand, and John Fernandez says in 07, there's no question, there's no doubt, that this is related to the employment activity of this gentleman. And what's interesting in this case, and struck me as interesting, is that Commissioner Lindsay, in her dissent, relies on a diagnostic study. She specifically says, as of February 21st, which is the day Hassan does the EMG, and in the documented report says this isn't work-related, and yet Commissioner Lindsay says, oh, I would dissent because it manifested itself and he should have given notice on February 21st. Well, if he gave notice on the 21st or the 22nd, what would he have said? I got carpal tunnel, but Hassan said it's not work-related. What does that do to anything? Your Honors, this case should be affirmed. And I will make one last comment. Counsel, in his reply brief, establishes that I misled the court in my description of the facts. I stand on my brief, and I stand on this record, and I would defy counsel to establish for this court, or for yours truly, anywhere that I misled this court. I ask that you affirm. Thank you. Reporter, please. Counsel played fast and loose with the facts. That's my honest opinion. I stand by it. It's in that brief, and I have a list of examples here. He said he'd been off work for months before he went to see the doctor in February. The payroll shows that he was paid through February 1st. So he wasn't off that. He says that he was trying to figure out what was wrong, he told Beth Carter. He was talking about February 2006. I didn't know what was wrong. I went to the doctor. Not when he says he sent reports to the doctor all through the summer about how it was getting worse. There's nothing, no evidence. I'm sorry, I don't mean to be offensive personally to counsel, but I do not understand where a whole bunch of these facts come from. And I have others, and others are put out in the brief. I just, it appears to me, I know that this is a progressive thing, but where did we progress to? And what evidence is there in this record that shows things were getting worse? And I understand what he's saying about, well, February, if he turned right around after he saw Dr. Hassan and filed a notice, that would have been dumb. Perhaps then it was March 8th when he went back, and that is the time that he was told. But he says, early in the year, I learned from Dr. Jovanovic that it was work-related, due to my work, and it was carpal tunnel. Maybe it was after Hassan said what he said, and then Jovanovic clarified to him what he believed it was. I'm trying to think if there's more. Do you have more questions? Thank you, counsel. Thank you very much. The court will take the matter under advisement for disposition.